UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 16-CV-11606-RGS

COREY HENRY,

v.

THOMAS HODOSON, et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

November 19, 2018

STEARNS, D.J.

Proceeding *pro se*, plaintiff Corey Henry brings this action, pursuant to 42 U.S.C. § 1983, against the Sheriff of Bristol County, three prison administrators, and seven correctional officers. Henry alleges that, while he was a pre-trial detainee in the admissions area of the Ash Street Jail, defendants assaulted him and fractured his toe ("used excessive force") in reaction to a report that he was "attempting to hang himself by preparing a noose." Am. Compl. ¶ 13. Henry complains that defendants then "took away his aircast" and "denied him a handicap shower" in deliberate indifference to his serious medical needs. *Id.* ¶¶ 16-17. On January 12, 2018, the court (O'Toole, J.) dismissed all counts against Sheriff Thomas Hodgson, Superintendent Steven Souza, Assistant Superintendent James Lancaster

and the excessive force claim against Assistant Deputy Superintendent Joseph Oliver, III. See Dkt #58. The case was reassigned to this session (Judge Richard G. Stearns) on January 23, 2018. The remaining defendants, Corrections Officers Edward Bouley, David Brizida, Eric Cousens, Jared Gosselin, Russell Lizotte, Paul Souza, and Douglas Znoj have moved for summary judgment on the two claims against them. Corey Henry has filed no Opposition.

## BACKGROUND

Defendants filed the following uncontroverted facts as part of their summary judgment motion.[1]

1. The Plaintiff is an inmate presently incarcerated at MCI Souza Baranowski Correctional Center in Shirley, Massachusetts.

2. On March 30, 2014, the New Bedford Police were in pursuit of the Plaintiffs vehicle following reports of two armed robberies in New Bedford committed by several men, one identified as the Plaintiff Cory Henry. (Exhibit 1-New Bedford Police Reports).

3. During the chase the Plaintiff attempted to evade police by travelling up to 80 MPH until he crashed into a light post, continued on and stopped only when it crashed into a cement pylon. (Exhibit 1).

---

[1] The motion for summary judgment was filed on October 17, 2018. As no Opposition has been filed, the Statement of Facts are "deemed for purposes of the motion to be admitted" by Corey Henry as uncontroverted. D. Mass. Local Rule 56.1

4. After the car stopped, the Plaintiff began running and jumped through hedges jumping down a five foot wall. (Exhibit 2).

5. At the time of booking the Plaintiff a Q5 check indicated a suicide attempt in 2012. (Exhibit 3 - Police Suicide Check Q5).

6. The Plaintiff, however, denied he was suicidal during the booking. (Exhibit 4 - Suicide Evaluation Form).

7. During his booking at the New Bedford Police Station, the Plaintiff alleged that he was injured in the car crash and police summonsed EMTS who transported him to St. Luke's Hospital. (Exhibit 5).

8. At St. Luke's Hospital the Plaintiff complained of back, neck, pelvis and chest pain. (Exhibit 6 - St. Luke's Hospital 03-30-14).

9. He was medically cleared for incarceration by the hospital with minor injuries and told to expect to be "sore, worse tomorrow." (Exhibit 6).

10. At 1:30 p.m. the New Bedford Police transported the Plaintiff to the Bristol County Regional Lock-Up facility in New Bedford.

11. During his booking with the Defendant at the Regional Lock-Up, the Plaintiff likewise denied any suicidal ideation. (Exhibit 7 - suicide screen).

12. At approximately 3:00 p.m. the Plaintiff fashioned his hospital Johnny (in which he had been given at St. Luke's Hospital) into a noose and was observed looking for a place to hang the noose. (Exhibit 8 - Officers' Incident Reports).

13. When the Plaintiff refused to "give up the noose without a fight," Sergeant Erie Cousins radioed for assistance and a correctional officers response team entered the cell to restrain the Plaintiff. (Exhibit 8).

14. The plaintiff refused to comply and was combative necessitating the forcible application of handcuffs and leg irons. (Exhibit 8).

15. Immediately after the application of restraints, the Plaintiff was immediately assessed by Nurse Lisa Barbosa who reported that the Plaintiff had no medical complaints at that time. (Exhibit 9 - Lisa Barbosa).

16. Due to the attempted suicide, the New Bedford Police were summonsed to pick up the Plaintiff and transport him to the New Bedford Crisis Center. (Exhibit 10 - BCSO return to NBPD).

17. The Plaintiff was seen at the Crisis Center (Child and Family Services, Inc.) immediately after transport by the police where he was assessed for the suicide attempt at the Regional Lock-Up. (Exhibit 11 - Crisis Center Adm. Note).

18. There is no doubt that he was suicidal/self-destructive as his intake at the Crisis Center quotes the Plaintiff as saying, "I really want to hang it up right now", "I put a lot of thought into death; a lot, a lot." He stated "if he were to go back to the jail, and if I were to slip my cuffs, and I could get away with hurting myself or someone, I would." (Exhibit 11).

19. At the Crisis Center, the Plaintiff gave a history of "significant history of polysubstance abuse/dependence and multiple dual diagnosis admissions as a well as a history of suicide attempts." (Exhibit 11).

20. Plaintiff, who discontinued his medication, was considered by the Crisis Center "a risk of harm to self and others due to significant risk factors including prior attempts, current legal problems, few supports, homelessness, drug dependence and mental illness." (Exhibit 11).

21. While on 1:1 suicide watch at the Crisis Center, the Plaintiff tried to hang himself by wrapping his blanket around his head and when the blanket was taken by the police officer watching him, he exhibited the same violent behavior as earlier at the

Regional Lock-Up in that the Plaintiff became violent and began throwing the cot around the room and taunting the officer necessitating other officers being called to subdue the Plaintiff. (Exhibit 12 Michael Santos note).

22. After release from the Crisis Center, the police again transported him back to St. Luke's Hospital when the Plaintiff complained of chest pains at the Police Station. (Exhibit 13 St. Luke's Hospital 2nd admission note).

23. At the hospital the Plaintiff admitted that he had an old fracture in his little toe which he said was re-injured when he was restrained. (Exhibit 13).

24. X-rays taken at the hospital confirmed that the toe was not fractured but that there was no evidence of a new fracture only evidence of a "subacute partially healed fracture of the fifth metatarsal with callous formation." (as compared to his x-ray of 11-15-2003). (Exhibit 14 - x-ray report).

25. On November 15, 2013, the Plaintiff was treated at St. Luke's Hospital for an assault with a baseball bat injuring inie-alia his left foot. (Exhibit 15 St. Luke's 11-15-03).

26. The Plaintiff was cleared to return to police custody and given a walking boot for support. (Exhibit 16).

27. After being transported to court by the police, the Plaintiff was held on bail and returned to the Defendant as a pre-trial inmate where he was placed under a Mental Health Watch. (Exhibit 17 - BCSO MHW form 3-3 1).

28. On the date of his return as a pre-trial detainee, he was seen by the contracted medical provider, Correctional Psychiatric Services (CPS) and given a medical order to continue to wear the walking boot until April 21, 2014 by Dr. Rencricca. (Exhibit 18).

29. No medical order was ever given for continuing the walking boot beyond April 21, 2014 (Exhibit 19 - Affidavit of Borges).

30. When the Plaintiff continued to complain of foot pain, he was examined by an orthopedic surgeon, Dr. VonErtfelda, in New Bedford who found "healed fracture 5th metatarsal-no treatment necessary" and recommended no follow-up. (Exhibit 20 - VonErtfelda note).

31. The Plaintiff's medical request for a handicapped shower was approved by Dr. Baker on June 12, 2014. (Exhibit 21).

32. Based on the order for a handicapped shower, the Plaintiff was told that he would be moved to a unit with access to a handicapped shower which initially pleased him. Late in the day he learned that his biological brother was being admitted to his unit and then refused being moved to a handicapped accessible unit so as to remain with this brother. (Exhibit 22 - Correction Officer Jared Talbot Incident Report 06-12-24).

33. Although the Plaintiff has denied the fact that he was given a handicapped shower, he admits that he refused the handicapped shower in the grievance filed by him on 06-14-2014 where he states: "I got approved for a handicap Shower today (06-12-14) . . . . I was told that I had to move to the EC Unit, but I couldn't do [it] for a personal reason." (Exhibit 23).

34. On that date, the Plaintiff claimed that he fell in the shower and sustained a small cut at his left eyebrow line which was dressed by the nurse. (Exhibit 24 - CPS progress note 06-12).

35. The Plaintiffs toe was not fractured when the correction officers forcibly prevented him from committing suicide. (Exhibit 8).

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphases in original). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). In assessing the genuineness of a material dispute, the facts are to be "viewed in the light most flattering to the party opposing the motion." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995).

*Excessive Force*

A pretrial detainee asserting an excessive force claim pursuant to 42 U.S.C. 1983, must show that the force used against him was "objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The actions of the officers must be assessed from the perspective of a "reasonable officer" on the scene with the knowledge possessed by that officer during the heat of the incident. *Id.* Additionally, the use of force must be weighed against the correction facility's legitimate interests in maintaining the security and safety of the institution. *Id.* There is no disputed evidence that would permit a reasonable factfinder to conclude that the force used to prevent plaintiff's suicide attempt was "objectively unreasonable" as defined in *Kingsley*. That claim will therefore be dismissed.

*Deliberate Indifference to Medical Needs*

Henry also contends that defendants failed to provide him with adequate medical care. In particular, Henry complains about the premature removal of his walking boot and denial of his use of a handicapped shower resulting in a fall. In opposition, defendants state that they relied on the medical judgments of Henry's health care providers, and that Henry himself refused relocation to a housing unit with a handicap shower, and, therefore, they cannot be held to have exhibited deliberate indifference to his needs.

To state an actionable claim of inadequate care, "a prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014). In an Eighth Amendment context, deliberate indifference implies criminal recklessness or the intentional neglect of a prisoner's health or his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). So defined, deliberate indifference encompasses "a narrow band of conduct, and requires evidence that the failure in treatment was purposeful." *Kosilek*, 774 F.3d at 82. Because "actual notice" of an inmate's specific need for medical care is required to show deliberate indifference, it follows that prison administrators and staff may,

except in the most obvious of instances, rely "on the opinions of the treating doctors." *Layne v. Vinzant*, 657 F.2d 468, 471-472 (1981); *see also Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) ("The policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one.").

Dr. Nicholas Rencricca ordered a left-foot walking boot for Henry to be worn from March 31, 2014 through April 21, 2014. "On April 28, 2014, the boot was removed from Mr. Henry and at no time was any further order given for a walking boot." Borges Aff. ¶ 6. When Henry continued to complain of foot pain, he was examined by an orthopedic surgeon, Dr. VonErtfelda, who found "healed fracture 5th metatarsal-no treatment necessary" and recommended no follow-up. With regard to the handicap shower, Dr. Lawrence Baker issued a special needs notification on June 12, 2014, for Henry to have access to one. Henry was told at 10:40 that morning that he would be moved to EC Unit where there was a handicap shower. That same day ("ten minutes later"), Henry's brother, Randy Silvia, was moved to EE Unit where Henry was housed. When Henry saw Silva, he refused to move to EC as he wanted to spend time with his brother. As Henry found the handicap shower to be unnecessary on June 12, 2014, no juror could find

defendants indifferent to a serious medical need for acceding to Henry's wishes. As a consequence, this claim is also dismissed against all remaining defendants.

## ORDER

For the foregoing reasons, the motion for summary judgment is ALLOWED. The Clerk will enter judgment for the defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns_____
UNITED STATES DISTRICT JUDGE